Case number 241876, David Lovell v. County of Kalamazoo, et al. Argument not to exceed 15 minutes per side. Mr. Stokin, you may proceed. Good morning, your honors. Richard Stokin on behalf of the appellant, Lindsey O'Neill. And I'm reserving five minutes for rebuttal as well, your honor. Thanks. I wanted to briefly start out and address the jurisdiction in this case. Plaintiff has harped on that in their response. And as they indicated in our brief and in our response to their motion to dismiss on jurisdictional grounds, we do believe that this is a case where there is a question of law. Much like the case in Williams v. Marra, there's a question of whether the legal standard was appropriately applied in this case. And it's our position that the district court, although they said they were applying the farmer analysis, they really applied the should-have-known analysis from Brawner. And that's where we believe there was actual legal error. And if you apply the law correctly to the facts, that there is actually a legal error, and that the court has jurisdiction to hear this appeal and all the issues that are up on appeal. Do you think we would have jurisdiction to review whether on the subjective prong, whether the evidence sufficed to show a strong likelihood of suicide? I think the court does in the sense of because the way the lower court analyzed the facts, they analyzed it under a, although they said it was the farmer analysis, they actually looked at it as a. I recognize your point. I was just curious about whether that is. So your point is that there was a legal error embedded in there. And I was just curious about setting aside the legal error. It seems like some of our cases have also just reviewed what might be described as a pure evidence sufficiency question of whether the legal standard of strong likelihood has been met by a certain facts. I believe we did argue that in our brief, that that is also grounds for jurisdiction aside from the legal error. So yes, I do believe this court has overall jurisdiction to review that if there is not sufficient facts. Is that consistent? Do you think that it gets tricky on what counts as an evidence sufficiency question and what counts as a mixed question that's reviewable? I mean, the argument could be made that that's just a pure evidence sufficiency question because it's about her state of mind, Nurse O'Neill's state of mind. But I believe when the court, if you go back and look at the precedence in the cases that we cited, what the court really was relying upon, in the other cases where they found state of mind questions, there has been evidence in the record supporting that the person knew, actually knew, or I don't want to say should have known, but there was information in there that they knew what was going on and they could have perceived the risk. In this case, when you look through the facts of Nurse O'Neill, he didn't, there was no indication, there's no dispute of the facts that he didn't have the records from the hospital indicating that the inmate, that this was suicidal. He didn't have the information that was relayed to, allegedly relayed to other officers. All he had was his assessment when he went in there, assessed him and spoke to him, and made a determination, and it wasn't just a willy-nilly ignoring what was going on. He made the assessment and removed him from a padded cell and a suicide gown, which also had a risk to this specific person because of his previous sexual assault and his state of mind. So they were moving him to a medical cell. Now, again, this is not a case where they just dumped him off into general population at the far end of the jail. Why isn't that the better argument? Because there was some deposition testimony of your client all but admitting that there was a suicide risk. And the question is, was the response to the suicide risk reasonable in recommending the isolation cell with the suicide blanket and monitoring? Well, also, it's kind of twofold. Just because somebody was a suicide risk at one point, the question is, was he a suicide risk at the time he was assessed by O'Neill? I thought, I mean, O'Neill said, yeah, I recognize a risk in our deposition. There's always a continued risk, but that's what, and then you go on to the next step. What were the reasonable steps taken after that? And he was to be placed in a medical cell, which is under observation. And keep in mind, this is all during COVID, so he couldn't be shipped off elsewhere. He was also supposed to be placed in there with a suicide blanket. Now, I think there's... I guess, change the facts a little bit. So suppose instead of recommending those accommodations, she just cleared them all together and also said, oh, and he can have razor blades for shaving. Do you, I mean, your argument that it wouldn't reach the subjective level would suggest that same fact pattern would be fine, even though there was some knowledge of a suicide potential. I think the argument, I think under those, you'd have to dig down deeper into those facts. Are the items that were provided... All the same facts about knowledge, and it's just the response was different. The response was instead of taking these precautions, it was giving the inmate razor blades. Well, I think you'd have to look at what kind of razor blade... If they were straight razor blades that somebody would have known to kill themselves, I think obviously that would probably be something. It's not the fact pattern. The reason why it's different, though, is that not... It's almost like I think, I envision a balancing. The more suicide risks, the more precautions that have to be made, whereas your test seems to be, unless there's this heightened suicide risk, the defendant is off the hook. And my point is perhaps the defendant, if the defendant is off the hook in this case, it's because the response was reasonable when evaluated against the knowledge, as compared to the razor blade case. Correct. I would agree with that assessment. So it's not... Doesn't that suggest, though, that spending time on subjective knowledge is less important than spending time on response? What she did in response and whether it was unreasonable to think when she's balancing everything, including the harm he's saying is being inflicted by being in this padded cell, that the compromise was okay? I would agree. I think the lower court focused more on the knowledge, and that's why I was focusing on that, and I think our briefs focus on it. But I do agree, and I thought our argument was included in there, that she did make a reasonable response to what... Or he made a reasonable response to the information that he had and the assessment that he made. It wasn't simply just dump them off into, like I said, the far end of the jail. That he did make a... Based upon the information he had, it was a reasonable response and a reasonable treatment was provided. An inmate is not entitled to perfect care. Defendants are entitled to qualified immunity, even if mistakes are made, if there was negligence. The question of whether there was deliberate indifference, and under these facts, we argue that there simply is no deliberate indifference, that there were steps taken. He did not know that there was a substantial suicide risk at that moment if he was moved. He assessed it and determined that it was a higher risk for him to remain in the cell where he was. He stepped down to a medical cell where there was going to be monitoring. There was no indication that the person, the inmate, or the decedent would be provided regular bedding. I think that testimony is clear. And there was no information from the hospital that later came on. And I think when you look at what the district court also relied upon, the testimony of plaintiff's expert Gerald Shiner, and I think our argument on that is not to his credibility. It was that he was making an ultimate assessment of, and jumping on the bandwagon of what should have known, what O'Neill should have known. And that's really what his testimony is, that, well, he should have known this. Well, when you have to look at the evidence, and I don't think the facts are disputed of what O'Neill actually knew and what O'Neill actually did. And when you apply those facts to the farmer legal analysis, our argument is that that, under those review and under this court's prior precedent in suicide cases, it simply does not rise to the level of a deliberate indifference, and O'Neill should have been granted governmental immunity. Can I just ask one question? Why do you think it's farmer that governs here? I mean, it's true that the facts, the death occurred in 2020, but at Qualified Humanities Step 1, whether there was a constitutional violation, why wouldn't we apply Brawner? And I believe the district court did the analysis on that. Brawner, and if I'm remembering correctly, as was set out in the district, first, I think plaintiff has waived that argument. I don't think they've, in their appeal, has argued that Brawner still applies. And as the district court correctly found, when the court ruled on Brawner initially, it was on excessive force cases. It wasn't clear that it applied to this type of case. And then later the ruling came down, but it was after this event in this case. So that's why the district court found correctly that farmer applies and not the higher standard of Brawner. Well, wait, that was after the events that took place, but not after the district court decided the case, right? And when we're deciding whether there was a constitutional violation, as opposed to whether it was clearly established, wouldn't we apply the law that is current at the time of appeal? Or at the time of the district court decision? Well, it's the law that was whether it was clearly established at the time they took their actions. I grant you the clearly established, Paul. I think that's right. Judge Gibbons, do you have any questions? No, I'm fine. OK. All right. Thank you. My apologies, your honors. I've been getting knocked off the zoom on and off for the past 10 minutes. But if I have the number to call, if I get knocked up again. Good morning. Christopher Patricus, may it please the court. On behalf of Plaintiff Appellee David Lovell, representing the state, his son Chase Lovell. This court is presented with both procedural and substantive grounds to dismiss the instant appeal. Procedurally, there's a lack of jurisdiction. Defendant's brief is littered with factual disputes, contests whether Defendant O'Neill did not believe that Chase was suicidal, that there was no evidence that she knew about the concealment of his suicidal ideation, and that nothing substantiates the warnings contained both verbally and in the medical records that Defendant O'Neill admitted that she reviewed. Do you think it's a it is a it is a legal question whether our law would have clearly established that O'Neill's response to the risk of suicide was exhibiting deliberate indifference? I agree that the whether the constitutional right being clearly established is a question of law. What what is so we can review that. What case clearly establishes that hurt her compromise decision when she's dealing with competing concerns? On the one hand, his anxiety being in the in the cell that she transferred him from. And on the other hand, the continued suicide risks of the use of a suicide blanket and continued monitoring. I'm curious what what case would have clearly established that that compromise was a violation of the Eighth Amendment. Yeah, so I think most directly on point is the case that I pointed to throughout my brief. And that case really aligns on all the major factual circumstances in this case. Similarly, with the case where the the defendant actor was the one who placed the the detainee in on suicide watch that the detainee. I mean, was placed on suicide watch, given their subjective belief of a strong likelihood of suicide. And the only thing that was done by the by the professional was to rely solely on the the detainee's denial of any current suicidal ideation. And the court really drew the distinction between negligence and deliberate indifference as negligence involved some level of professional judgment that is relying upon a reasonable assessment. Whereas deliberate indifference is merely a cursory, a cursory review, not not at all interested in doing a reasonable assessment of the competing interest. And in this case, much like that case there, that's really all that was relied upon by O'Neill, both in her deposition and in her transfer, transfer case. She claims that she just relied on the fact that, and I think it's also understated that at the time she was placed in the empath, she acknowledged that he satisfied as a substantial suicide risk. So I think that case might be distinguishable based on the response, though. So I recognize it was the same type of just an interview. But here she did take some precautions there. I thought it was just placement in general population. I believe that the grab out case that there was some precautions, which, which sites and relies heavily on the construct case. But I think the distinction between the grab out case where the treating physician released them from segregation with suicide preventative measures in place was not, was not the, was not the only decision maker, for lack of a better term, throughout the entire process. The physician in the grab out case cleared them, but did not release them out of segregation. And did not communicate to the officers who were in charge of following the safety, the protective measures that the inmate was being released from suicide watch that they at one point had a substantial risk of suicide. Unlike in our case where O'Neill was the one who placed him in the empath, was the one who assessed him in the empath, and was the one after 22 minutes talking through the glass of the empath, and having knowledge that Chase has a history of downplaying his current suicidal ideation, released him into the medical unit. And with, with additionally the conditions of the suicide preventative blanket, the constant monitoring, which would really contradict her, her basis. Because, I mean, if she believed that his current suicidal ideation didn't exist, then it wouldn't make any sense to install those, those protective measures. And she admitted in her own deposition that the reason why the suicide blanket was, was ordered was purely out of a suicide risk motivation, and that it wouldn't make any sense to order that protective measure if the risk of suicide didn't still persist. Right, but, but he was, he hung himself with regular bedsheets, and she didn't order that those be provided. In fact, she said he should have a blanket, a suicide blanket instead of the bedsheets. So how is it that we can hold her responsible for the regular bedsheets being delivered? I guess I don't know how the regular bedsheets got delivered. So the regular bedsheets were delivered after he was transferred to, to the medical unit by one of the office, one of the officers from the county jail. The argument would be that her decision to release Faith from the medically padded cell that was the most protective measure against suicide was, there was, there was no basis or motivation to do it. Basically by acknowledging when she transferred him that he still presented a suicide risk as indicated by his, the protective measures placed on there, coupled with her knowledge that he would downplay his suicidal ideation as a means to free himself up to, to accomplish his, his goal of committing suicide doesn't happen if he doesn't disregard that substantial risk and that knowledge that, that she had. And that she personally acknowledged she, she drew by her records when she put him in the medically padded cell saying he's current, he's an imminent risk of suicide or self-harm. Counsel, can you remind me, what are the facts that show that nurse O'Neill knew, or maybe she's not a nurse, in any event, O'Neill knew about the fact that your client would downplay his risk in order to be transferred? Yeah, and I think there's, I mean, it's pretty extensive record. I think I've found four, there's four independent sources, sources of it. I think the most, the strongest is when Chase was in the Borges ER in July of 2020, and as contained in his, his records, an IS, the ISK clinician, her last name is Benahus, was called to the hospital and to physically be present there. Note that the snippet from that record that I contained in my brief where it says that initially upon entry in the ER, he denied any suicidal intent to the triage nurses. And then 20 minutes later, he admitted to the, to the treating doctor that not only does he have a current suicidal ideation, but he has a plan to follow it through. That, that clinician from ISK was also the, the ISK member that saw him on December 12th upon his entry into Borges where, where criminal charges would stem from him trying to kill himself. And that was contained in the December 12th note that O'Neill admits that she reviewed. Additionally, the O'Neill in her deposition said that she reviewed every note and every, every medical record in the ISK EMR, which was also attached to defendant's motion for summary judgment. And within those records, it says, quote, patient is deemed to be an unreliable historian due to withholding information. It references that he denied suicidal ideation, but his mother reported that he held a gun to his head and talked about hanging himself. So that record, which O'Neill admits that she reviewed much like the ISK notes by the, the nurses on December 12th, clearly indicates that he has a repeating pattern of downplaying, not being a good historian, particularly with respect to his current level of suicidal ideation. All right. Thank you. Additionally. Oh, sorry. No, I thought, I thought you were done. I'm sorry. You only have a few minutes left. So if there's something else you wanted to discuss or another judge has a question. Just to follow up on Judge Larson's question from earlier, what's, what's the best evidence that she should be held at fault for the bed sheets, making their way into the cell. When she issued instructions saying they should not be there. Well, I would say that that's the best evidence of that is that she knowingly released him with that from a place where that is not a feasible option inside the MPAD cell before she had any of the, of the release record. From, from his psychiatric treatment that stemmed from stemmed to him getting arrested. He knew that he would, she personally realized that he was a continuing high suicide risk and that by releasing him, it would, I mean, her purpose of releasing him was to give him more freedom, therefore more opportunity to make a valid attempt at his own life. So it, whether, I mean, our position is that both parties are liable. Both parties were deliberately indifferent, but certainly one of the county jail staff members failure to follow the precautions does not alleviate or conscious disregard of his still maintained substantial risk of suicide. All right. Council, you're, you probably can't see your red light, but it is on. And no, it's fine. Unless my colleagues have further questions. Judge Gibbons. Okay. We'll hear a rebuttal. First, I want to start off with the defendant is Lindsay, James O'Neill. I think at some point in time we've called him, her, it's actually, it's a him. Thanks for the, I actually had a question on that. So thanks for the clarification. I think when we see the middle name, it's easier. I just want to touch on a few things. Plaintiff's counsel pointed out the Comstock case and what, and I think we distinguish that in our plaintiffs, but in that case it was clear that the assessing person knew that there was still an ongoing risk and really didn't take any precautions from there. That is different than what O'Neill did in this case. Because there was actually the balancing of what should we do? Should we leave him in the suicide gown in the padded cell or should we remove him into another location? And again, I think that's the distinction from the cases that we cite versus the cases Pelley cites is that we actually did take reasonable response to the suicide risk. It wasn't just dumping him off and ignoring it. And I think you made a good point with the bed sheets. O'Neill specifically put on that thing that was supposed to be in medical, again, this is where he was going to be monitored, in a suicide blanket. There's no indication anywhere in the record. I know counsel wants to impugn that, but there's nothing in the record that O'Neill knew that he was actually going to receive regular sheets. It kind of goes against it. I think his testimony was... On the record, I could see a theory that O'Neill might be deliberately indifferent if prison staff consistently violated orders. And so if it was just a common practice that bed sheets made their way in despite instructions to the contrary. Is there any evidence like that in the record? I don't recall seeing any evidence in the record that something O'Neill would have known about. I believe there was testimony that suicide blankets have been given out if somebody is particularly cold and in a single cell. They'll give them a blanket because it is a heavier weighted blanket. But I think the testimony was that they wouldn't just hand them out willy-nilly because obviously if you're in a cell with multiple people, then multiple people would want them and it would just create more of a problem for the jail and for the security reasons. But I don't believe there's anything in the record that O'Neill knew or should have known or even would have known that when she makes the order that he's to go in there with the suicide blanket that he would then be given the regular sheets as well. I don't think there's anything in the record for that. And that's what just kind of distinguishes this from the Comstock case. And I just also want to go back to the Comstock case. Even if in this case O'Neill made a bad judgment or a negligent judgment, that's not deliberate indifference. And that's not under this court's prior rulings on suicide cases, that doesn't rise to the level of deliberate indifference. And that's what, again, distinguishes our case from the other cases that are cited. Unless the court has any other questions. Judge Murphy? Judge Gibbons? No. All right. Thank you very much. Thanks to both counsel for your arguments and for being patient with our technology. Oh, I'm sorry. Oh, no, I didn't. No, I was going to say I apologize. Thank you very much. All right. Thank you. And the case is submitted and the clerk may call the next case.